UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>GENERAL MOTORS COMPANY, MARY T. BARRA, and PAUL A. JACOBSON,<br><br>                    Defendants. | Civ. No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff City of Hollywood Police Officers' Retirement System ("Plaintiff" or "Hollywood Police"), individually and on behalf of all others similarly situated, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (1) General Motors Company's ("GM" or the "Company) regulatory filings with the U.S. Securities and Exchange Commission ("SEC"); (2) press releases and media reports issued and disseminated by the Company; (3) analyst and media reports concerning the Company; and (4) other public information regarding the Company, including statements made by GM executives.[1]  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This securities class action is brought on behalf of all persons and entities that purchased or otherwise acquired GM securities between February 10, 2021 and October 26, 2023, inclusive (the "Class Period").  The claims asserted herein are alleged against GM, Mary T. Barra, and Paul A. Jacobson (collectively, "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

---

[1]  Emphasis has been added unless otherwise noted.

2.      GM is a multinational automotive manufacturing company headquartered in Detroit, Michigan.  GM designs, builds, and sells trucks, crossovers, cars, and automobile parts worldwide.  The Company primarily manufactures four automobile brands, Chevrolet, GMC, Cadillac, and Buick, and also holds interests in Chinese brands Baojun and Wuling.

3.      Cruise LLC ("Cruise") is a subsidiary of GM that develops autonomous vehicle ("AV"), or self-driving, technology.  Cruise has secured testing and driving permits to expand the use of its AVs on the premise that those AVs did not pose an unreasonable risk to the public, assuring regulators and investors that safety was the Company's "gating metric."

4.      Additionally, GM's products have been the subject of multiple recalls because of defective airbag components in the Company's vehicles since at least as early as November 2020, exposing the Company to various lawsuits.  Despite these issues, GM has consistently downplayed safety concerns related to its vehicles' airbags and the need to record additional warranty accruals for related product recalls.  At the same time, the Company touted its efforts to identify and address perceived defects with its vehicles' airbag inflators.

5.      Throughout the Class Period, Defendants misled investors by: (1) downplaying safety concerns with the airbags in GM vehicles; (2) failing to disclose the need to record additional warranty accruals for recalls related to the defective

airbags; (3) overstating the extent and efficacy of its efforts to analyze defects in its vehicles' airbag inflators; (4) concealing serious safety and consumer protection issues raised by Cruise's AV technology from regulators and investors; (5) overstating the prospect for widespread regulatory approval and adoption of Cruise's AV products; and (6) withholding from investors the true scope of the increased risk of regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm.

6.      The truth about the serious safety concerns involving the Company's airbags and AV technology was revealed over a series of disclosures beginning on October 2, 2023.  On that date, news outlets reported that a pedestrian in San Francisco had suffered major injuries after she was run over by and pinned beneath a driverless Cruise AV.  That same day, reports emerged of another accident in Nashville, Tennessee in which two people were injured after a Cruise vehicle crashed into an apartment building.  On this news, GM's stock price fell $1.09 per share, or 3.36%, to close at $31.38 per share on October 3, 2023.

7.      Next, on October 5, 2023, the National Highway Traffic Safety Administration ("NHTSA") held a public hearing regarding its recommendation to recall more than 50 million airbag inflators that have been linked to potentially deadly explosions.  *The Wall Street Journal* ("*WSJ*") subsequently reported that at least 20 million of GM's vehicles were built with the defective airbag inflators in

question, with at least one contributing to a confirmed death.  On this news, GM's stock price fell $0.73 per share, or 2.35%, to close at $30.31 per share on October 5, 2023.

8.     Then, on October 24, 2023, the California Department of Motor Vehicles ("California DMV") suspended Cruise's deployment and driverless testing permits, citing "an unreasonable risk to public safety."   In suspending Cruise's permits, the California DMV stated that Cruise "ha[d] misrepresented … [the] safety of the autonomous technology of its vehicles."  On this news, GM's stock price fell $0.66 per share, or 2.26%, to close at $28.56 per share on October 24, 2023.

9.     Finally, on October 26, 2023, NHTSA officials said they were investigating five additional reports of Cruise self-driving cars engaging in inappropriately hard braking that resulted in collisions.  Later that day, Cruise announced that it would suspend all of its AV operations nationwide "while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust."  On this news, GM's stock price fell $1.33 per share, or 4.66%, to close at $27.22 per share on October 27, 2023.

10.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of the Company's securities, Plaintiff and the Class (defined herein) suffered significant losses and damages under the federal securities laws.

## **JURISDICTION AND VENUE**

11.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Defendant GM is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

15.     Plaintiff Hollywood Police, as set forth in the attached Certification, acquired GM securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant GM is a Delaware corporation with principal executive

offices located at 300 Renaissance Center, Detroit, Michigan 48265-3000.   GM's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "GM."

17.     Defendant Mary T. Barra ("Barra") has served as GM's Chief Executive Officer and Chair of GM's Board of Directors at all relevant times.

18.     Defendant Paul A. Jacobson ("Jacobson") has served as GM's Executive Vice President and Chief Financial Officer at all relevant times.

19.     Defendants Barra and Jacobson are sometimes referred to herein collectively as the "Individual Defendants."  The Individual Defendants, because of their positions within GM, possessed the power and authority to control the contents of GM's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading.  The Individual Defendants are liable for the false statements pleaded

herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

20.    GM designs, manufactures, and sells trucks, crossovers, cars, and automobile parts around the world.  The Company is most known for its four automobile brands:  Chevrolet, GMC, Cadillac and Buick.

21.    Cruise, a subsidiary of GM, develops AV, or self-driving, technology. Cruise has secured testing and driving permits for its AVs on the premise that those AVs did not pose an unreasonable risk to the public.  GM acquired Cruise in 2016. By mid-2018, GM invested billions of dollars into the research and development of Cruise's AV technology.  In October 2020, the California DMV granted a permit to Cruise for testing fully driverless vehicles based on the purported safety of its technology.  In December 2020, Cruise began testing Cruise AVs without a human safety driver present on the streets of San Francisco.

22.    GM's products have also been the subject of multiple recalls because of defective airbag components in the Company's vehicles since at least as early as November 2020.

### Materially False and Misleading Statements Issued During the Class Period

23.    The Class Period begins on February 10, 2021, after defective airbag

components on various GM automobiles became subject to product recalls and Cruise AVs began testing on public roads in California without safety drivers. On that date, GM filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K downplayed safety concerns with the airbags in GM's vehicles and the need to record additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators, stating, in relevant part:

> In November 2020, NHTSA denied GM's petitions for inconsequentiality relating to the Takata passenger-side inflators in certain GMT900 vehicles. NHTSA has directed that we replace the airbag inflators in the vehicles in question, and *we have decided not to contest NHTSA's decision*. While we have already begun the process of executing the recall, given the number of vehicles in this population, the recall will take several years to be completed.

> Accordingly, in the three months ended December 31, 2020, we recorded a warranty accrual of $1.1 billion for the expected costs of complying with the recall remedy.

> GM has recalled certain vehicles sold outside of the U.S. to replace Takata inflators in those vehicles. There are significant differences in vehicle and inflator design between the relevant vehicles sold internationally and those sold in the U.S. *We continue to gather and analyze evidence about these inflators and to share our findings with regulators*. Additional recalls, if any, could be material to our results of operations and cash flows. We continue to monitor the international situation.

> There are several putative class actions that have been filed against GM, including in the federal courts in the U.S., in the Provincial Courts in Canada, and in Mexico and Israel, arising out of *allegations* that airbag

inflators manufactured by Takata are defective. At this stage of these proceedings, we are unable to provide an estimate of the amounts or range of possible loss.

24.     With respect to Cruise's AV technology, regulatory approvals, and the purported public benefits of and safety controls for its products, the 2020 10-K stated, *inter alia*:

> We expect autonomous technology to lead to a future of zero crashes, zero emissions and zero congestion. We believe that building all-electric vehicles with autonomous capabilities integrated from the beginning, rather than through retrofits, is the most efficient way to unlock the tremendous potential societal benefits of self-driving cars. In January 2020, the Cruise Origin was unveiled by Cruise which is being co-developed by GM, Cruise and Honda Motor Company, Ltd. (Honda). The Cruise Origin will be built on General Motors' all-new modular architecture, powered by the Ultium battery system. In October 2020, Cruise received a permit from the California Department of Motor Vehicles to remove back-up drivers from Cruise AV test vehicles in San Francisco and subsequently began truly driverless testing. Also in October 2020, GM and Cruise announced they will file an exemption petition with the National Highway Traffic Safety Administration (NHTSA) seeking regulatory approval for the Origin's deployment, and have withdrawn an earlier exemption petition that was limited to the Cruise AVs derived from the Chevrolet Bolt platform. In January 2021, we announced that Microsoft Corporation (Microsoft) will join us and other investors in a $2.2 billion investment in Cruise. Cruise may continue to opportunistically seek additional funding in this round in 2021. Given ***the potential of all-electric self-driving vehicles to help save lives***, reshape our cities and reduce emissions, the goal of Cruise is to deliver its self-driving services as soon as possible, ***with safety being the gating metric***.

25.     Appended as an exhibit to the 2020 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "[t]he [2020 10-K] fully complies with the requirements of

section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

26.     On May 5, 2021, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2021 (the "1Q21 10-Q").   The 1Q21 10-Q contained substantively the same statements as referenced in ¶ 23, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

27.     With respect to the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects, the 1Q21 10-Q stated, in relevant part:

> We are actively testing our autonomous vehicles in the U.S. Gated by safety and regulation, we continue to make significant progress towards commercialization of a network of on-demand autonomous vehicles in the U.S.

28.     Appended as an exhibit to the 1Q21 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

29.     On August 4, 2021, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2021 (the "2Q21 10-Q").   The 2Q21 10-Q contained substantively the

same statements as referenced in ¶ 23, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

30.     The 2Q21 10-Q also contained substantively the same statements as referenced in ¶ 27, *supra*, regarding the safety and development of Cruise's AV technology.

31.     Appended as an exhibit to the 2Q21 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

32.     On October 27, 2021, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2021 (the "3Q21 10-Q").    The 3Q21 10-Q contained substantively the same statements as referenced in ¶¶ 23 and 26, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

33.     The 3Q21 10-Q also contained substantively the same statements as referenced in ¶¶ 27 and 30, *supra*, regarding the safety and development of Cruise's AV technology.

34.     Appended as an exhibit to the 3Q21 10-Q were substantively the same

SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

35.     On February 2, 2022, GM filed an annual report on Form 10-K with the SEC during pre-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K").   The 2021 10-K downplayed safety concerns with the airbags in GM's vehicles and the need to record additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators, stating, in relevant part:

> In November 2020, the NHTSA directed that we replace the airbag inflators in our GMT900 vehicles, which are full-size pickup trucks and SUVs, and *we decided not to contest NHTSA's decision*. While we have already begun the process of executing the recall, given the number of vehicles in this population, the recall will take several years to be completed. Accordingly, in the year ended December 31, 2020, we recorded a warranty accrual of $1.1 billion for the expected costs of complying with the recall remedy, and *we believe the currently accrued amount remains reasonable*.

> GM has recalled certain vehicles sold outside of the U.S. to replace Takata Corporation (Takata) inflators in those vehicles. There are significant differences in vehicle and inflator design between the relevant vehicles sold internationally and those sold in the U.S. *We continue to gather and analyze evidence about these inflators and to share our findings with regulators.* Any additional recalls relating to these inflators *could* be material to our results of operations and cash flows.

> There are several putative class actions that have been filed against GM, including in the federal courts in the U.S., in the Provincial Courts in Canada and in Mexico, arising out of *allegations* that airbag inflators manufactured by Takata are defective. At this stage of these proceedings, we are unable to provide an estimate of the amounts or

range of possible loss.

36.     With respect to Cruise's AV technology, regulatory approvals, and the purported public benefits of and safety controls for its products, the 2021 10-K stated, *inter alia*:

> Cruise is driving leadership in the development and commercialization of AV technology. We believe that building all-electric vehicles with autonomous capabilities integrated from the beginning, rather than through retrofits, is the most efficient way to unlock the tremendous potential societal benefits of self-driving cars. The Cruise Origin, a purpose-built, all-electric, self-driving vehicle that is being co-developed by GM, Cruise and Honda Motor Company, Ltd. (Honda), will be built on General Motors' all-new modular architecture, powered by the Ultium platform, at Factory ZERO starting in early 2023, pending government approvals. In October 2020, Cruise received a driverless test permit from the California [DMV] to remove test drivers from Cruise autonomous test vehicles in San Francisco and subsequently began fully driverless testing. In October 2020, GM and Cruise also announced they will file an exemption petition with the [NHTSA] seeking regulatory approval for the Origin's deployment, and withdrew an earlier exemption petition that was limited to the Cruise AV derived from the Chevrolet Bolt platform.

> In June 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles. In September 2021, Cruise received approval of its Autonomous Vehicle Deployment Permit from the California [DMV] to commercially deploy driverless AVs. Cruise will need one additional permit from the CPUC to charge the public for driverless rides in California. Given ***the potential of all-electric self-driving vehicles to help save live***s, reshape our cities and reduce emissions, the goal of Cruise is to deliver its self-driving services as soon as possible, but as Cruise continues to expand and scale its operations ***safety will continue to be the gating metric — supported by Cruise's Safety Management System and its other risk identification, assessment and mitigation processes***.

37.     Appended as an exhibit to the 2021 10-K were signed certifications pursuant to SOX wherein the Individual Defendants certified that "[t]he [2021 10-K] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

38.     On March 18, 2022, GM issued a press release announcing additional investments in its Cruise division, while touting the capability and safety of Cruise's AV technology, stating, in relevant part:

> Since GM acquired a majority ownership stake in 2016, Cruise has made self-driving cars a reality and is a leader on the pathway to commercial autonomous ridesharing and delivery, creating significant value for both GM shareholders and Cruise's minority shareholders.

* * *

> Last month Cruise achieved a significant milestone toward its vision of a safer, more sustainable and accessible transportation future as it became the first company to offer fully driverless rides to the public in a major U.S. city.

> The Cruise Origin … has been purposefully designed from the ground up to operate without a human driver. This means it does not rely on certain human-centered features, like a steering wheel or a sun visor, to operate safely.

39.     On April 27, 2022, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2022 (the "1Q22 10-Q").   The 1Q22 10-Q contained substantively the same statements as referenced in ¶ 35, *supra*, downplaying safety concerns with the

airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

40.     With respect to the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects, the 1Q22 10-Q stated, in relevant part:

> Gated by safety and regulation, Cruise continues to make significant progress towards commercialization of a network of on-demand AVs in the United States and globally. In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California [DMV] to commercially deploy driverless AVs. Cruise will need one additional permit from the CPUC to charge the public for driverless rides in California.

41.     Appended as an exhibit to the 1Q22 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

42.     On July 26, 2022, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2022 (the "2Q22 10-Q").   The 2Q22 10-Q contained substantively the same statements as referenced in ¶¶ 35 and 39, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

43.     The 2Q22 10-Q also contained substantively the same statements as referenced in ¶ 36, *supra*, regarding the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects, while also touting that, "[i]n June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco."

44.     Appended as an exhibit to the 2Q22 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

45.     On August 2, 2022, GM issued a press release touting, in relevant part, that Cruise "has now completed over a quarter of a million driverless miles and thousands of driverless rides in San Francisco as of August 1, 2022" and that "[t]he next steps for Cruise in the second half include working with regulators to increase their hours of operation and service area, expanding their fleet of Bolt AVs and testing the Cruise Origin."

46.     On October 25, 2022, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2022 (the "3Q22 10-Q").   The 3Q22 10-Q contained substantively the same statements as referenced in ¶¶ 35 and 39, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the

Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

47.     The 3Q22 10-Q also contained substantively the same statements as referenced in ¶¶ 40 and 43, *supra*, regarding the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects.

48.     Appended as an exhibit to the 3Q22 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

49.     On January 31, 2023, GM filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 10-K").   The 2022 10-K contained substantively the same statements as referenced in ¶ 23, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

50.     With respect to Cruise's AV technology, regulatory approvals, and the purported public benefits of and safety controls for its products, the 2022 10-K stated, *inter alia*:

> General Motors and Cruise are pursuing what we believe is the most comprehensive path to autonomous mobility in the industry. In September 2021, Cruise began operating a driverless ride hail service in San Francisco, California, and in June 2022, began charging the public for driverless rides. Cruise continues to make regulatory progress in California. In December 2022, Cruise received regulatory approval to expand its operational design domain in California. Cruise is also seeking regulatory approval to add the Cruise Origin to its driverless test permit. Additionally, in September 2022,

Cruise acquired regulatory permits to operate driverless ride hail services in Phoenix, Arizona and began pursuing ride hail operations in Austin, Texas. Given *the potential of all-electric self-driving vehicles to help save lives*, reshape our cities and reduce emissions, the goal of Cruise is to deliver its self-driving services as soon as possible, but as Cruise continues to expand and scale its operations, *safety will continue to be the gating metric, supported by Cruise's Safety Management System and its other risk identification, assessment and mitigation processes*.

We believe that building all-electric vehicles with autonomous capabilities integrated from the beginning, rather than through retrofits, is the most efficient way to unlock the tremendous potential societal benefits of self-driving cars. The Cruise Origin, a purpose-built, all- electric, self-driving vehicle that is being co-developed by GM, Cruise and Honda Motor Company, Ltd. (Honda) will be built on GM's all- new modular architecture, powered by the Ultium platform, at Factory ZERO starting in 2023 pending government approvals. GM and Cruise are awaiting a decision on an exemption petition that was filed with the [NHTSA] seeking regulatory approval for the Origin's deployment.

51.     Appended as an exhibit to the 2022 10-K were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

52.     On April 25, 2023, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2023 (the "1Q23 10-Q").   The 1Q23 10-Q contained substantively the same statements as referenced in ¶ 23, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

53.     The 1Q23 10-Q also contained substantively the same statements as

referenced in ¶¶ 40 and 43, *supra*, regarding the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects, while also touting that, "in September 2022, Cruise acquired regulatory permits to operate driverless ride hail services in Phoenix, Arizona and began pursuing ride hail operations in Austin, Texas"; and that "GM and Cruise are also awaiting a decision on an exemption petition that was filed with NHTSA seeking regulatory approval for the deployment of the Cruise Origin."

54.     Appended as an exhibit to the 1Q23 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

55.     On May 12, 2023, news outlets reported that GM had issued a recall for almost a million of its vehicles because of defective airbags.   For example, an article published by *Bloomberg* that day, entitled "GM to Recall Nearly 1 Million Vehicles Over Defective Air Bags", stated, in relevant part:

> General Motors Co. is recalling nearly 1 million vehicles over concerns that their air bag inflators could explode during deployment.
>
> The action involves certain Buick Enclave, Chevrolet Traverse and GMC Acadia vehicles from model years 2014 through 2017, the [NHTSA] said Friday in a filing. A total of 994,763 vehicles are being recalled.

56.     On July 25, 2023, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2023 (the "2Q23 10-Q").   The 2Q23 10-Q contained substantively the same

statements as referenced in ¶ 23, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

57.     With respect to the recent additional recall of vehicles by GM to address its latest airbag safety issues, the 2Q23 10-Q stated, in relevant part:

> In May 2023, we initiated a voluntary recall covering nearly one million 2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia SUVs equipped with driver front airbag inflators manufactured by ARC Automotive, Inc. (ARC), and accrued an immaterial amount for the expected costs of the recall. As part of its ongoing investigation into ARC airbag inflators, NHTSA has issued a recall request letter to ARC, in which the agency (a) tentatively concluded that a defect related to motor vehicle safety exists in 67 million frontal driver and passenger air bag inflators manufactured by ARC and supplied to a number of automakers, including GM, and (b) demanded that ARC issue a recall notice for these inflators. ARC has disputed the recall request, asserting that no identified defect trend exists in the inflators and that any problems are related to isolated manufacturing issues. Depending on the outcome of the dispute between NHTSA and ARC, and the possibility of additional recalls, the cost of which may not be fully recoverable, it is reasonably possible that the costs associated with these matters in excess of amounts accrued could be material, but we are unable to provide an estimate of the amounts or range of reasonably possible material loss at this time.

> There are several putative class actions that have been filed against GM, including in the U.S., Canada, and Israel, arising out of allegations that airbag inflators manufactured by ARC are defective. At this stage of these proceedings, we are unable to provide an estimate of the amounts or range of reasonably possible material loss.

58.     The 2Q23 10-Q also contained substantively the same statements as

referenced in ¶¶ 40, 43, and 53, *supra*, regarding the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects.

59.     Appended as an exhibit to the 2Q23 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

60.     The Defendants' statements referenced in ¶¶ 23-54 and 56-59 were materially false and misleading because they: (1) downplayed safety concerns with the airbags in GM vehicles; (2) failed to disclose the need to record additional warranty accruals for recalls related to the defective airbags; (3) overstated the extent and efficacy of its efforts to analyze defects in its vehicles' airbag inflators; (4) concealed serious safety and consumer protection issues raised by Cruise's AV technology from regulators and investors; (5) overstated the prospect for widespread regulatory approval and adoption of Cruise's AV products; and (6) withheld from investors the true scope of the increased risk of regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm.

## The Truth Is Revealed

61.     On October 2, 2023, during after-market hours, several news outlets reported that a pedestrian had been seriously injured by a driverless Cruise taxi. *NBC Bay Area* published an article entitled "Hit-and-run driver strikes pedestrian, tossing her into path of Cruise car in San Francisco" (the "*NBC* Report"), which stated that a pedestrian suffered major injuries after she was run over by and pinned beneath a

driverless Cruise AV.  According to the *NBC* Report:

> A woman crossing a normally busy stretch of downtown San Francisco suffered serious injuries Monday night after a hit-and-run driver struck her, throwing her into the path of an oncoming driverless Cruise car, which then ran her over, according to video recorded by the [AV] that Cruise showed to the NBC Bay Area Investigative Unit.

> \* \* \*

> The collision occurred around 9:30 p.m. near the corner of Fifth and Market streets. The driverless Cruise vehicle and the other sedan were traveling side-by-side, southbound on Fifth Street, according to video recorded by the driverless car. Cruise would not provide NBC Bay Area with a copy of the video but did show it to Senior Investigative Reporter Bigad Shaban.

62.     Cruise told reporters that it was cooperating with law enforcement regarding the incident.  According to the *NBC* Report:

> "The [AV] then braked aggressively to minimize the impact," said Navideh Forghani, a Cruise spokesperson. "The driver of the other vehicle fled the scene, and at the request of the police the [AV] was kept in place. Our heartfelt concern and focus is the well-being of the person who was injured, and we are actively working with police to help identify the responsible driver."

> Rescuers found the woman pinned beneath the left rear axel of the Cruise vehicle, according to San Francisco Fire Department Capt. Justin Schorr. After Cruise disabled the car remotely, rescuers were then "able to get the car up off her" and used the jaws of life to free her.

> \* \* \*

> The woman suffered multiple traumatic injuries and was taken to San Francisco General Hospital, according to first responders. Her condition was still unknown as of late Tuesday.

> Cruise tells the NBC Bay Area Investigative Unit it is turning over video of the accident to the San Francisco Police Department, which is

now investigating the crash.

63.     In addition, the *NBC* Report noted that the accident was not the first safety incident with a Cruise AV, and stated that the California DMV had launched a safety probe into Cruise's AVs back in August 2023:

> The California DMV, which is responsible for regulating autonomous vehicles across the state, has already been in the midst of investigating Cruise's safety record after what the agency described as "recent concerning incidents."
>
> The DMV launched its probe back in August, following a collision between a Cruise vehicle and a San Francisco fire truck.
>
> In conjunction with its announcement, the DMV also noted that Cruise agreed to cut its San Francisco fleet of driverless cars in half, limiting the company to just 50 vehicles during the day and 150 vehicles during the evening hours while the DMV continues its investigation.
>
> The DMV, which has the power to order driverless vehicles off the road by suspending or revoking their permits, has yet to issue any findings relating to its Cruise investigation or release a timeline of when it plans to do so.

On this news, GM's stock price fell $1.09 per share, or 3.36%, to close at $31.38 per share on October 3, 2023.

64.     Then, on October 5, 2023, the NHTSA held a public hearing to field commentary and testimony on its recommendation that more than 50 million airbag inflators that have been linked to potentially deadly explosions be recalled.  *The Wall Street Journal* ("*WSJ*") subsequently reported that at least 20 million of GM's vehicles were built with the defective airbag inflators in question, with at least one

contributing to a confirmed fatality:

> [GM] has at least 20 million vehicles built with a potentially dangerous air-bag part that the government says should be recalled before more people are hurt or killed.

> The number of affected GM vehicles—a figure that hasn't been disclosed publicly—makes the Detroit-based automaker among the most exposed in a push by U.S. auto-safety regulators to recall 52 million air-bag inflators designed by Tennessee-based auto supplier ARC Automotive, according to people familiar with the matter.

> These inflators have been known to explode with too much force during a vehicle crash, sending metal shrapnel flying and hitting occupants in the face and neck with shards. At least two people have been killed, and several others injured in such incidents.

> The [NHTSA] has yet to release how many vehicles overall would be covered by a recall, or which specific models would be affected. The number of GM cars and trucks with these inflators could be higher depending on how regulators proceed.

> On Thursday, NHTSA held a public meeting on its determination that the air-bag parts are defective and should be recalled. In April, the regulatory agency sent a letter to ARC, demanding it recall the inflators, which are essentially mini-exploding devices designed to rapidly inflate the air-bag cushion in a collision.

> A recall of this size would be among the U.S.'s largest in history.

> \* \* \*

> GM so far has done five recalls over a span of six years on vehicles that have the ARC-made air bags.

> The latest one was earlier this year, when it recalled nearly one million Chevrolet and Buick SUVs, after a Michigan woman was injured in a crash in March. GM said in a statement, it believes the evidence and data presented by NHTSA at this time doesn't provide a basis for any further recalls, and the ones it has conducted already were done out of an abundance of caution.

On this news, GM's stock price fell $0.73 per share, or 2.35%, to close at $30.31 per share on October 5, 2023.

65.     Just a few weeks later, on October 24, 2023, the California DMV suspended Cruise's deployment and driverless testing permits, citing "an unreasonable risk to public safety."   In suspending Cruise's permits, the California DMV stated that Cruise "ha[d] misrepresented … [the] safety of the autonomous technology of its vehicles."   In a press release, the California DMV stated:

> The California DMV today notified Cruise that the department is suspending Cruise's [AV] deployment and driverless testing permits, effective immediately. The DMV has provided Cruise with the steps needed to apply to reinstate its suspended permits, which the DMV will not approve until the company has fulfilled the requirements to the department's satisfaction. This decision does not impact the company's permit for testing with a safety driver.
>
> Today's suspensions are based on the following:
>
> a. 13 CCR §228.20 (b) (6) – Based upon the performance of the vehicles, the Department determines the manufacturer's vehicles are not safe for the public's operation.
>
> b. 13 CCR §228.20 (b) (3) – The manufacturer has misrepresented any information related to safety of the autonomous technology of its vehicles.
>
> c. 13 CCR §227.42 (b) (5) – Any act or omission of the manufacturer or one of its agents, employees, contractors, or designees which the department finds makes the conduct of autonomous vehicle testing on public roads by the manufacturer an unreasonable risk to the public.
>
> d. 13 CCR §227.42 (c) – The department shall immediately suspend or revoke the Manufacturer's Testing Permit or a Manufacturer's

> Testing Permit – Driverless Vehicles if a manufacturer is engaging
> in a practice in such a manner that immediate suspension is required
> for the safety of persons on a public road.

On this news, GM's stock price fell $0.66 per share, or 2.26%, to close at $28.56
per share on October 24, 2023.

66.    Then, on October 26, 2023, the NHTSA publicly released a letter the
agency had sent to Cruise six days earlier indicating that the NHTSA was
investigating five reports of Cruise vehicles engaging in inappropriately hard
braking that resulted in collisions:

> Since opening [the investigation], this office has received reports of
> five (5) incidents in which a Cruise [Automated Driving System
> ("ADS")] equipped vehicle initiated a braking maneuver with no
> stated obstacles ahead and with another road user approaching from
> the rear. In each case, the other road user subsequently struck the rear
> of the ADS equipped vehicle. The ADS equipped vehicles involved
> were operating without onboard human supervision at the time of each
> crash.

67.    Later that day, after close of market, Cruise announced via a post on
X (formerly Twitter) that it would pause all of its AV operations across the country
"while we take time to examine our processes, systems, and tools and reflect on how
we can better operate in a way that will earn public trust":

> (1/3) The most important thing for us right now is to take steps to
> rebuild public trust. Part of this involves taking a hard look inwards and
> at how we do work at Cruise, even if it means doing things that are
> uncomfortable or difficult.

* * *

(2/3) In that spirit, we have decided to proactively pause driverless operations across all of our fleets while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust.

\* \* \*

(3/3) This isn't related to any new on-road incidents, and supervised AV operations will continue.

We think it's the right thing to do during a period when we need to be extra vigilant when it comes to risk, relentlessly focused on safety, & taking steps to rebuild public trust.

On this news, GM's stock price fell $1.33 per share, or 4.66%, to close at $27.22 per share on October 27, 2023.

68.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of the Company's securities, Plaintiff and the Class have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

69.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the documents and public statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information

27

reflecting the true facts regarding GM, and their control over and/or receipt and/or modification of GM's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

70.     Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complexity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

71.     The Individual Defendants, because of their positions within GM, controlled the contents of GM's public statements during the Class Period.   The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public and that the positive representations that were being made were false and misleading.  As a result, each of the Defendants is responsible for the accuracy of GM's corporate statements and is, therefore responsible and liable for

the representations contained therein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants and their families, and directors and officers of GM and their families and affiliates.

73.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, GM securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.     There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class

members include:

    a.    Whether Defendants violated the Exchange Act;

    b.    Whether Defendants' statements and/or actions mispresented material facts;

    c.    Whether Defendants' statements and/or actions omitted material necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.    Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

    e.    Whether Defendants' misconduct impacted the price of GM securities;

    f.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

    g.    The extent of damages sustained by Class members and the appropriate measure of damages.

75.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

76.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.   Plaintiff has no interests in conflict with those of the Class.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>**PRESUMPTION OF RELIANCE**</u>

78.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.   GM common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

b.   As a regulated issuer, GM filed periodic public reports with the SEC and the NYSE;

c.   GM regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and;

d.   GM was followed by several securities analysts employed by

major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, and which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

79.     As a result of the foregoing, the market for GM securities promptly digested current information regarding GM from publicly available sources and reflected such information in the price of GM securities. Under these circumstances, all purchasers of GM securities during the Class Period suffered similar injury through their purchase of GM securities at artificially inflated prices and the presumption of reliance under the fraud-on-the-market doctrine applies.

80.     Further, at all relevant times, Plaintiff and other Class members relied on Defendants to disclose material information as required by law. Plaintiff and other Class members would not have purchased or otherwise acquired GM securites at artificially inflated prices if Defendants had disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

81.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

82.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

83.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    a.     Employed devices, schemes, and artifices to defraud;

    b.     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of GM securities during the Class Period.

85.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GM securities. Plaintiff and the Class would not have purchased GM securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements

86.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of GM securities during the Class Period.

## **COUNT II**

### **For Violations of Section 20(a) of the Exchange Act**
### **(Against the Individual Defendants)**

87.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     The Individual Defendants acted as controlling persons of GM within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about GM, the Individual Defendants had the power and ability to control the actions of GM and its employees. By reason of

such conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Declaring this action to be a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Awarding Plaintiff and the members of the Class damages with interest;

C.      Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  January 24, 2024                    Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Francis P. McConville*
Francis P. McConville
Eric Belfi
Guillaume Buell
140 Broadway
New York, New York  10005
Tel: (212) 907-0700
Fax: (212) 818-0477
fmcconville@labaton.com
ebelfi@labaton.com

gbuell@labaton.com

Matthew Henzi
Cynthia Billings-Dunn
AsherKelly
25800 Northwestern Highway, Suite 1100
Southfield, Michigan 48075
Tel: (248) 746-2710
mhenzi@asherkellylaw.com
cbdunn@asherkellylaw.com

*Counsel for Plaintiff and the Proposed Class*

Robert D. Klausner
Stuart Kaufman
Klausner, Kaufman, Jensen & Levinson
7080 Northwest 4th Street
Plantation, Florida 33317
Tel: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Plaintiff*

## **CERTIFICATION**

I, David Strauss, as Chairman of City of Hollywood Police Officers' Retirement System ("Hollywood Police"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Hollywood Police.  I have reviewed a complaint prepared against General Motors Company ("GM") alleging violations of the federal securities laws and authorize the filing of this pleading;

2.      Hollywood Police did not purchase securities of GM at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Hollywood Police is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Hollywood Police fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Hollywood Police's transactions in GM securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Hollywood Police sought to serve or currently serves as a lead plaintiff or representative party in the following class actions under the federal securities laws filed during the last three years:

*City of Hollywood Police Officers' Retirement System v. Citrix Systems, Inc.*,
No. 0:21-cv-62380 (S.D. Fla.)
*Jastram v. NextEra Energy, Inc.*, No. 9:23-cv-80833 (S.D. Fla.)
*Pembroke Pines Firefighters & Police Officers Pension Fund v. Adobe, Inc.*,
No. 1:23-cv-09260 (S.D.N.Y.)

6.      Beyond its pro rata share of any recovery, Hollywood Police will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 24th day of January, 2024.

_____
*David Strauss*
Chairman
Hollywood Police Officers' Retirement System

**EXHIBIT A**

**TRANSACTIONS IN GENERAL MOTORS COMPANY**

| Transaction Type | Trade Date | Shares | Share Price | Cost / Proceeds |
|---|---|---|---|---|
| Purchases | 4/6/2021 | 2,028.00 | $61.3194 | ($124,355.74) |
| Purchases | 4/6/2021 | 1,634.00 | $62.5164 | ($102,151.80) |
| Purchases | 4/7/2021 | 1,753.00 | $61.1539 | ($107,202.79) |
| Purchases | 4/9/2021 | 1,925.00 | $59.8423 | ($115,196.43) |
| Purchases | 4/20/2021 | 1,637.00 | $55.4503 | ($90,772.14) |
| Purchases | 5/26/2021 | 173.00 | $58.0650 | ($10,045.25) |
| Purchases | 5/26/2021 | 3,985.00 | $57.7628 | ($230,184.76) |
| Purchases | 5/26/2021 | 3,343.00 | $57.8008 | ($193,228.07) |
| Purchases | 5/26/2021 | 495.00 | $57.6450 | ($28,534.28) |
| Purchases | 8/23/2021 | 2,617.00 | $47.8256 | ($125,159.60) |
| Purchases | 8/23/2021 | 261.00 | $48.0250 | ($12,534.53) |
| Purchases | 8/23/2021 | 652.00 | $47.5450 | ($30,999.34) |
| Purchases | 8/26/2021 | 1,885.00 | $48.6563 | ($91,717.13) |
| Purchases | 8/26/2021 | 257.00 | $48.6650 | ($12,506.91) |
| Purchases | 8/26/2021 | 257.00 | $48.9500 | ($12,580.15) |
| Purchases | 9/2/2021 | 2,110.00 | $49.2580 | ($103,934.38) |
| Purchases | 9/2/2021 | 3,189.00 | $49.1650 | ($156,787.19) |
| Purchases | 9/2/2021 | 652.00 | $49.0456 | ($31,977.73) |
| Purchases | 9/24/2021 | 11,866.00 | $52.3185 | ($620,811.32) |
| Purchases | 9/27/2021 | 264.00 | $52.8750 | ($13,959.00) |
| Purchases | 9/27/2021 | 1,824.00 | $52.8884 | ($96,468.44) |
| Purchases | 1/24/2022 | 1,749.00 | $50.7473 | ($88,757.03) |
| Sales | 2/22/2022 | (15,486) | $46.5608 | $721,040.55 |
| Purchases | 4/13/2022 | 3,088.00 | $40.1618 | ($124,019.64) |
| Sales | 8/11/2022 | (2,059) | $38.3673 | $78,998.27 |
| Sales | 8/18/2022 | (1,808) | $38.3558 | $69,347.29 |
| Sales | 10/6/2022 | (929) | $34.7654 | $32,297.06 |
| Sales | 10/6/2022 | (127) | $34.6178 | $4,396.46 |
| Sales | 10/28/2022 | (1,561) | $38.3666 | $59,890.26 |
| Sales | 10/28/2022 | (1,561) | $38.4285 | $59,986.89 |
| Sales | 10/28/2022 | (1,267) | $38.4402 | $48,703.73 |
| Purchases | 1/12/2023 | 1,936.00 | $38.0770 | ($73,717.07) |
| Purchases | 1/13/2023 | 598.00 | $36.1711 | ($21,630.32) |
| Purchases | 1/13/2023 | 618.00 | $36.0615 | ($22,286.01) |
| Purchases | 2/1/2023 | 2,201.00 | $39.4895 | ($86,916.39) |
| Sales | 4/25/2023 | (416) | $33.4691 | $13,923.15 |
| Sales | 4/25/2023 | (2,021) | $33.4640 | $67,630.74 |
| Sales | 4/26/2023 | (216) | $32.6226 | $7,046.48 |

| Transaction Type | Trade Date | Shares | Share Price | Cost / Proceeds |
|---|---|---|---|---|
| Sales | 4/26/2023 | (337) | $32.9572 | $11,106.58 |
| Sales | 4/27/2023 | (276) | $32.2512 | $8,901.33 |
| Purchases | 8/3/2023 | 210.00 | $37.0650 | ($7,783.65) |
| Purchases | 10/5/2023 | 198.00 | $30.6557 | ($6,069.83) |